People v Rivera (2024 NY Slip Op 50309(U))

[*1]

People v Rivera

2024 NY Slip Op 50309(U)

Decided on March 21, 2024

Supreme Court, New York County

Conviser, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 21, 2024
Supreme Court, New York County

The People of the State of New York

against
Justin Rivera, Defendant.

Ind. No. 74357/2022

New York County District Attorney Alvin L. Bragg (Jennifer Sharpe and Mathew Jacinto, of counsel) for the People.
Brian Hutchinson, for the Defendant.

Daniel Conviser, J.

The Defendant moves here pursuant to CPL 330.30 (3) to vacate his judgment of conviction for Criminal Possession of a Weapon in the Second Degree and Reckless Endangerment in the First Degree based on newly discovered evidence. He also moves to vacate the judgment based on an alleged discovery violation by the People. For the reasons outlined here, the Defendant's motion to vacate the conviction pursuant to CPL 330.30 (3) is denied but his motion to vacate the convictions based on a discovery violation is granted pursuant to CPL 245.80. The Defendant also moves to dismiss the reckless endangerment count on grounds of legal insufficiency. That motion is denied. 
The Defendant was the subject of a jury trial before this Court which extended following jury selection over a period of 3 ½ days and ended with a verdict on the second day of deliberations on December 22, 2023. The Defendant was convicted of one count of Criminal Possession of a Weapon in the Second Degree under PL § 265.03 (3), alleging that he possessed a loaded firearm outside his home or place of business; acquitted of Criminal Possession of a Weapon in the Second Degree under PL § 265.03 (1) (b), alleging he possessed a loaded firearm with the intent to use it unlawfully against another and convicted of Reckless Endangerment in the First Degree under Penal Law § 120.25.
The motion here is based on the disclosure, during the second day of jury deliberations, that the key witness in the case, Detective Ricketts, had a more than six minute interaction with the Defendant in January of 2023 which was captured on his available body camera footage but was never previously disclosed. Detective Ricketts also apparently testified briefly about this interaction but did so in a significantly inaccurate manner and wrongly asserted he had not documented any interactions with the Defendant.
Statement of Facts
The trial evidence indicated that a person fired 5 shots from a gun at approximately 8:50 p.m. on August 7, 2022 in the vicinity of 1759 Lexington Avenue in Manhattan, near the corner [*2]of 109th street. The shots did not hit anyone but apparently hit an unoccupied car and shattered its glass. The only contested issue was the identity of the shooter. The vast majority of the trial evidence proved someone fired these shots. A video of the shooting was introduced into evidence although this brief video clip did not allow the shooter to be identified. Multiple police officers testified about being called to the scene, hearing shots or seeing or recovering shell casings. A "shot spotter" representative testified to the fact that shots were fired and what time and location they came from. A ballistics expert opined that all of the five shell casings recovered at the scene came from the same firearm. The car owner testified to the damage to her car.
The People identified the shooter as the Defendant through video clips from the 110th street and Lexington Avenue subway station. These video clips first showed a man who resembled the Defendant along with another man apparently following someone out of the station. Different video sources next showed a man with a shirt over his head following this man The People argued the man with the shirt over his head was the same person whose face was seen inside the subway station who the People argued was the Defendant. Then, a different video clip showed shots being fired by someone where the man with the shirt over his head had been following the other man. Finally, the videos showed the man with the shirt over his head return to the station and take the shirt off his head, again revealing a person who resembled the Defendant.
The evidence indicating that the person who fired the shots at the location was the Defendant was sparse. No gun was recovered and there was no forensic evidence linking the Defendant to the gun. The video of the shooting itself did not allow the jury to determine who the shooter was. The Defendant made no inculpatory statements. No witnesses testified to the shooting or who had committed it. The alleged target of the shooting did not testify. No motive was established for the shooting, beyond the vague notion that the Defendant, the person he was with and the target may have been members of gangs or groups who had conflicts. The subway videos were clear as was the implicit argument that the sequence of videos showed that whoever was identified in the subway videos must have been the shooter.
In the Court's view, however, it was not completely clear from the videos alone that the person in the subway station was the Defendant, rather than someone who looked like him. The identification of this person as the Defendant was made by one person, the key witness on whom the entire case ultimately depended: Detective Michael Ricketts. It is his inaccurate testimony undisclosed body-camera footage which is basis of this motion.
Testimony of Detective Ricketts
Detective Ricketts testified that he was a 16 year NYPD veteran, was assigned to the 23rd precinct's intelligence division and was the "field intelligence officer'. He said he knew the Defendant, Justin Rivera and had met him in November of 2020. On that occasion he said he spoke to Mr. Rivera for about 15 minutes at a building in the neighborhood. He said the interaction was in a well-lit room, that Mr. Rivera was not wearing a mask, that he was about 2-3 feet away from Mr. Rivera and that he learned Mr. Rivera's name during the interaction.
Detective Ricketts then said he had also interacted with Mr. Rivera on two or three other occasions after that, each time for about 15 minutes. He said the interactions took place at a housing development in the neighborhood where Detective Ricketts often went. During the first interaction, he said, Mr. Rivera was talking to him but Detective Ricketts was tending to something else. The second interaction took place during the day, Mr. Rivera's face was not [*3]obstructed and Detective Ricketts was again 2-3 feet away from Mr. Rivera. He also testified that he had seen Mr. Rivera in the neighborhood about 10-15 times. He said he had seen Mr. Rivera both during the day and at night. He testified that Mr. Rivera had not been arrested or accused of committing a crime during any of these interactions.
Detective Ricketts said he had been reviewing Mr. Rivera's social media accounts since about 2020, had looked at Mr. Rivera's social media pages about 40 or 50 times and taken screen shots of them. The People introduced two screen shots of Mr. Rivera from social media which were authenticated by Detective Ricketts. Detective Ricketts identified Mr. Rivera from body-worn video footage in the subway station taken after the shooting. He also testified that he knew the person he believed was the intended target of the shooting, who the People asserted Mr. Rivera followed out of the subway.
Detective Ricketts claimed he had not documented his interactions with Mr. Rivera over 2-3 years in any way. In one passage, Detective Ricketts appeared to describe an incident which was later revealed to be reflected in the body-cam footage which is the subject of the instant motion. During this testimony, however, Detective Ricketts appeared to describe this interaction (which actually occurred in January of 2023) as one of the interactions he had earlier described as occurring significantly prior to that time. He testified that a person had been arrested pursuant to a warrant who had been driving a car and that Justin Rivera had been standing at the scene at the time but was not arrested and not the subject of any arrest paperwork. Transcript, pp. 380-381. He did not reveal that he had captured this interaction on body-cam footage. Indeed, since he testified that he had not documented his interactions with Mr. Rivera in any way, this assertion during his testimony was inaccurate.
Detective Ricketts testified that after the shooting, which occurred on August 7th, 2022, he reviewed subway station videos and still photographs taken from them. He said he identified Mr. Rivera as the person in the subway videos a little more than two weeks later, on August 24, 2022. 
The Defense Argument
During his summation, Defendant's counsel implicitly conceded the argument that whoever was identified in the videos as the person in the subway station the People alleged was the Defendant had committed the shooting. The defense argument was that this person was not the Defendant. That argument, in turn, focused primarily on one contention: that Detective Ricketts' testimony identifying the Defendant in the subway videos was unreliable and inaccurate. The defense also argued the police investigation was deficient and that the police did not seek to evaluate who the shooter was once Detective Ricketts identified that person.
The defense began by saying that "it was one witness who set off the chain of events leading to Justin [Mr. Rivera] being here now. One witness who came in and said he viewed those videos and that person was Justin Rivera on those videos". Id, p. 459. The defense argued "this comes down to the reliability, the credibility of Detective Ricketts and his identification". Id., p. 464. "[A]nyone having this distinct a memory from one interaction from two years ago, that they are that confident years later, you would be suspect of that." Id., p. 465. The defense argued Detective Ricketts had an interest in the case and had provided no documentation of his interactions with Mr. Rivera. "All we are left with is his memory to rely on. As you saw, that is an unreliable memory". Id.
The defense asserted that Detective Ricketts took four pages of trial transcript to answer a question about when a photo of the Defendant had been posted on social media. Counsel [*4]argued that Detective Ricketts had not investigated whether a person who had earlier shot at the same person Mr. Rivera was alleged to have shot at may have been the shooter in this case. He argued that the fact that Detective Ricketts had spent so much time following Justin Rivera on social media when Mr. Rivera had not been arrested for any crime was either "very odd or is not true". Id., p. 468. The defense also pointed out that Detective Ricketts was the only police officer in the precinct who said he could identify Mr. Rivera. Photos of the Defendant identified by Detective Ricketts were a "lineup of one". Id., p. 469. 
The Disclosure of the Additional Ricketts/Rivera Interaction and Body-Cam Footage
On the morning of the second day of deliberations, prior to the verdict which was received on the same day, the People revealed that in a conversation between ADA Sharpe and Detective Ricketts the prior evening, Detective Ricketts had revealed that he had mistakenly not testified to an interaction he had with Mr. Rivera in January of 2023 and had not turned over body-cam footage. The prosecutor explained that she had been speaking to Officer Ricketts the prior evening because he was a witness in another case she was prosecuting. The People then obtained and turned over the body-cam footage to the defense and the Court.
Detective Ricketts' body-cam footage comes from an interaction on January 13, 2023 during the day. It lasts for 6 minutes and 45 seconds. It first shows the police driving to a location apparently at a public housing development and then interacting with three young men in a parked car. Mr. Rivera is in the back seat and there is a person in the driver's seat and the front passenger seat. All three are directed to exit the car. The driver is searched and handcuffed. Mr. Rivera is searched by Officer Ricketts. At one point one of the officers, although it is not clear who, asks Mr. Rivera "what's your name man", to which Mr. Rivera replies "Justin Rivera". As part of its opposition to this motion, the People provided an affidavit from one of the officers at the scene, Detective Jonathan Goenner, asserting he was the person who asked the Defendant his name. Mr. Rivera is wearing a head covering which covers his hair and neck but his face is clearly visible and for a significant part of the video it is clear Mr. Rivera is standing only a few feet from Detective Ricketts with the two directly facing each other.
Ensuing conversations reveal that one of the persons in the car, apparently the driver, had just been released from jail but was subject to a bench warrant. The driver who is handcuffed asks for his mother to be notified. She arrives at the scene and angrily argues with the police about why her son is being detained. At no point in the interaction is there any indication that Detective Ricketts has any familiarity with or in any way knows Mr. Rivera. While this interaction occurred prior to Detective Ricketts' in-court identification of the Defendant as the person in the subway video, it occurred after Detective Ricketts first identified Mr. Rivera from the video during the investigation. As noted earlier, this initial identification of Justin Rivera as the person in the subway video was the subject of an argument by the defense during summation that the identification was not reliable. Detective Ricketts had apparently identified the interactions he had with Mr. Rivera in the body-cam footage as one of the bases on which he was able to identify Mr. Rivera as the shooter on August 24, 2022. That interaction, however, actually occurred about 6 months after Detective Ricketts initially identified the Defendant as the shooter. The interaction actually occurred on January 13, 2023.
Reversal Based on Newly Discovered Evidence
A verdict may be set-aside following a conviction and prior to sentence if new evidence has been discovered since the trial which could not have been obtained by the defendant with due diligence "and which is of such character as to create a probability that had such evidence [*5]been received at the trial the verdict would have been more favorable to the defendant". CPL 330.30 (3). In this case, the newly discovered evidence arose on the second day of deliberations, shortly before the verdict, rather than after the verdict was rendered. At that point, however, there was no ability to have the "evidence . . . received at trial" and, in the Court's view, the same standard should apply.
The People make a number of arguments the Court does not agree with about why the motion to vacate pursuant to CPL 330.30 (3) should be denied. In the Court's view, however, the motion must be denied because the Court cannot conclude that the new evidence (the revelation of the January 2023 interaction between Detective Ricketts and Mr. Rivera along with its underlying body-cam footage) created a "probability" that such evidence would have resulted in a more favorable verdict for the Defendant. This evidence would have impeached Detective Ricketts' testimony. But the Court cannot conclude such impeachment would have likely resulted in an acquittal. Rather, in the Court's view, and as more fully explained below, the new evidence created a reasonable possibility that Mr. Rivera would be acquitted.
Reversal Based on Discovery Violation
Pursuant to CPL 245.80, where required discovery is belatedly disclosed, the court "shall impose a remedy or sanction that is appropriate and proportionate to the prejudice suffered by the party entitled to disclosure". CPL 245.80 (1). In the Court's view, such a discovery violation occurred here and merits the extreme remedy of a conviction vacatur. The statute actually also addresses the precise situation which occurred here and the precise standard the Court has found was met in this case, that is, the "reasonable possibility" that the belated disclosure "contributed to the result at the trial". Pursuant to CPL 245.80 (3):
The failure of the prosecutor or any agent of the prosecutor to disclose any written or recorded statement made by a prosecution witness which relates to the subject matter of the witness's testimony shall not constitute grounds for any court to order a new pre-trial hearing or set aside a conviction, or reverse, modify or vacate a judgment of conviction, in the absence of a showing by the defendant that there is a reasonable possibility that the non-disclosure materially contributed to the result of the trial or other proceeding;
The People first raise a number of threshold arguments for why the belated disclosure should not warrant a conviction vacatur. The Court does not agree with any of these arguments. They first make the important point that the Ricketts/Rivera interaction in January of 2023 post-dated the charges in this case and the People's original Certificate of Compliance ("COC"), which they say was accurate when it was filed. It is certainly obvious that the People could not have possibly disclosed the Ricketts/Rivera interaction in their initial COC. 
The violation here, however, concerns the People's continuing discovery obligations pursuant to CPL 245.60. The People argue that the Ricketts/Rivera interaction did not relate to the subject matter of the case and the People were therefore not under any duty to disclose it. It is certainly true that there may be many situations in which an interaction between a testifying prosecution police witness and a defendant many months after an alleged crime may not be relevant to a case. The interaction here did not concern the allegation that Mr. Rivera fired a gun in August of 2022. But it was critical to the only contested issue in this case: the reliability of Detective Ricketts' identification.
The People also argue that the interaction "didn't become discoverable until the moment the detective testified to its content at trial". People's addendum to their initial response, page 4. But, in the Court's view, that is obviously not correct. The discovery obligation arose when this [*6]critical evidence was created almost a year before the trial began. The People also allege the defense did not exercise due diligence in seeking the body-cam footage. But the obligation to provide prior statements of testifying prosecution witnesses is on the People—not the Defendant. The People also allege the motion here was untimely and should have been made prior to the trial. But, obviously, the defense did not know about the missing discovery until shortly before the verdict. 
CPL 245.60 provides in relevant part:
If either the prosecution or the defendant subsequently learns of additional material or information which it would have been under a duty to disclose pursuant to any provisions of this article had it known of it at the time of a previous discovery obligation or discovery order, it shall expeditiously notify the other party and disclose the additional material and information as required for initial discovery under this article. The People did notify the Court and the defense promptly upon learning of the existence of the Ricketts/Rivera interaction and its associated body-cam footage. However, the People were charged with the possession of the footage under the discovery statute at the time it was created, almost a year before the trial. Pursuant to CPL 245.20 (2): "all items and information related to the prosecution of a charge in the possession of any New York state or local police or law enforcement agency shall be deemed to be in the possession of the prosecution". Under the circumstances, in the Court's view, the failure to turn-over the body-cam footage for almost a year after it was created was a discovery violation. 
Remedy for Discovery Violation
In deciding the appropriate remedy for this violation, in the Court's view, it must first be recognized that the violation here involved minimal fault by the People. It did not concern the People's original COC. It concerned a continuing discovery obligation. The People, moreover, were unaware of the violation until it was disclosed shortly before the verdict and then acted properly to disclose it. Prosecutors, of course, should make diligent efforts to ascertain the prior statements of its police witnesses but the Court cannot conclude such diligent efforts were not made in this case. 
Dismissal of course is an extreme remedy for a discovery violation. It should always be the last option, in the Court's view. The problem here is that, because of the timing of the disclosure, other remedies were foreclosed. Had the disclosure been made during the trial, the Court would likely not have considered a conviction vacatur or mistrial. Officer Ricketts could have been recalled to continue his testimony. An appropriate adjournment could have been granted. An adverse inference instruction could have been given. Given the fact that the disclosure occurred shortly before the verdict, however, none of these options were available. CPL 245.80 (2) lists a number of possible sanctions for a discovery violation. Here, in the Court's view, the only viable options given the timing of the disclosure were a mistrial (which neither party sought) or a dismissal. The Court now is in the position of either vacating the conviction or imposing no remedy for the People's discovery violation at all. 
Had missing body-cam footage with respect to any other prosecution witness been belatedly disclosed, it is difficult to see how such evidence could have impacted the verdict. Much of the police testimony was cumulative. But Detective Ricketts was the essential witness. His familiarity with the Defendant was the dispositive question.
The Court believes the extreme remedy of vacatur is appropriate because of the great significance of the disclosure. Had the body-cam footage been disclosed it would have [*7]supported the defense argument for acquittal in multiple important ways. First, it would have impeached the accuracy of Detective Ricketts' memory. Detective Ricketts did, as noted earlier, appear to testify about the encounter which is the subject of the instant motion. But he testified about it inaccurately in multiple respects. He ascribed it to a different time than it actually occurred. He testified in a blatantly incorrect manner when he said he had not documented his interactions with the Defendant in any way. He failed to turn-over his body-cam footage to the prosecutor. 
His failure to recall the incident was also odd in two ways. While asserting he recalled precise details of interactions he had with the defendant years ago, the interaction he failed to accurately recall was his most recent. Second, he testified, it was this interaction (which he apparently testified occurred prior to his initial identification of the Defendant in 2022 but actually occurred long after that identification), among other encounters, which allowed him to initially identify the Defendant as the likely shooter. The defense vigorously argued this initial identification was wrong. But what the defense did not know and could not point out to the jury was that one of the key bases for this identification which Detective Ricketts testified to occurred long after the identification was made. All of this could have been argued to the jury had, for example, Officer Ricketts testified as he did and then, prior to the jury beginning deliberations, been recalled to correct his prior testimony. But that never occurred because the violation was only disclosed the day after deliberations began.
Second the content of the body-cam footage could have been used by the defense to argue that Detective Ricketts' testimony that he was very familiar with the Defendant was wrong. In the Court's view, the video is striking because it provides no indication that Detective Ricketts and the Defendant, in 2023, had any familiarity with each other. The video shows them standing and apparently looking directly at each other from a short distance. At one point, indeed, someone (who the People assert was Detective Goenner) asks Mr. Rivera what his name is. What is not shown is what might be expected given Detective Ricketts' testimony about his great familiarity with Mr. Rivera. For example, Detective Ricketts might have supplied Mr. Rivera's name. He might have spoken to Mr. Rivera using his name. Mr. Rivera might have acknowledged Detective Ricketts. None of that occurred. Rather, the video depicts two people who apparently had no prior familiarity with each other.
These two arguments in combination: that Detective Ricketts' memory of his interactions with the Defendant was grossly impaired, and/or that he had misrepresented the degree of his familiarity with the Defendant, in combination, in the Court's view, would have provided the defense much greater support for its acquittal argument. It would, in the Court's view have created a reasonable possibility of an acquittal. The Court has not concluded that Detective Ricketts lied. He appears to have made an honest mistake. The People acted with the highest ethical standards in disclosing the interaction as soon as they learned about it. But the Court believes the missing evidence may well have changed the verdict.
It is finally worth noting that the disclosure here concerned the accuracy of a one-witness identification which was the dispositive and only seriously contested issue in the case. "The importance of identification evidence is, of course, self-evident". People v. Perdue, 2023 NY SlipOp 0604, 2023 WL 8629190, SlipOp at 1 (citation omitted). As the Court of Appeals explained at great length just a few months ago in Perdue, "[i]naccurate identifications, especially misidentifications by a single eyewitness, play a role in the vast majority of post-conviction DNA-based exonerations". Id. SlipOp at 6. The Court's point here is not that it [*8]believes Mr. Rivera is innocent. It is that the defense had the right to argue he was mistakenly identified and therefore had not been proven guilty beyond a reasonable doubt using all of the evidence it was entitled to present. That did not happen.
Legal Sufficiency of Reckless Endangerment Count
The Defendant was convicted under Count 3 of the indictment of Reckless Endangerment in the First Degree under PL § 120.25. This crime occurs when "under circumstances evincing a depraved indifference to human life, he [a defendant] recklessly engages in conduct which creates a grave risk of death to another person". The Court reserved decision on the Defendant's motion for a trial order of dismissal made during the trial on this count, pursuant to CPL 290.10. The Court now holds that the evidence supporting the Defendant's conviction for Reckless Endangerment in the First Degree was legally sufficient.
On a motion for a trial order of dismissal, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". People v. Lagano, 39 NY23d 108, 111 (2022) (internal quotation omitted) (emphasis in original).
"Depraved indifference" means "an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. A determination that a defendant acted depravedly indifferent is a highly fact-specific inquiry". People v. Edwards, 36 NY3d 946, 947 (2020) (citations and internal quotations omitted).
Distinguishing cases where a defendant's conduct meets the standard of depraved indifference, rather than recklessness, is notoriously difficult. Viewing the evidence in a light most favorable to the People, the facts the People presented were as follows. The Defendant fired five shots from a firearm at a person. There was no evidence he fired at a crowd, or fired randomly or was not aiming to hit a specific target. At least one and possibly additional shots hit the glass of an unoccupied car, although no bullets were recovered from that car or any other place. Police officer Ramos testified that there were 8-10 civilians on the scene after the shooting but their precise locations were not provided. No information was provided through testimony about how many people may have been in the vicinity of the gunshots at the time the gun was fired. Officer Ramos testified that most of the buildings in the neighborhood had first-story apartments and that the buildings had second-floor apartments. Officer Ramos said the intersection where the shooting occurred was "a busy intersection". Transcript, p. 338.
The People point out, however, that the legal sufficiency of the depraved indifference counts was also supported by video evidence. This video evidence showed numerous vehicles in the line of fire of the shooter. The People also point out that videos showed pedestrians in the location where the Defendant shot.
Appellate courts in other cases involving shootings in densely populated urban areas have found evidence legally insufficient to meet the depraved indifference standard. In the Court's view, however, the quantum of evidence in this case was greater than in cases where courts have found similar evidence legally insufficient. In People v. Scott, 70 AD3d 978 (2nd Dept 2010), lv denied, 15 NY3d 778; 15 NY3d 809 the defendant accosted a man and his wife with a gun at the entrance to their home in Flushing Queens at 9:25 p.m. and then fired two shots at the man while he was running to the back of his house. The target then ran to a parking area behind his house and towards the street and heard another shot. The target then tripped and engaged in a struggle with the defendant who robbed him. The Court held that the evidence supporting the first degree [*9]reckless endangerment count was legally insufficient reasoning the People "presented no evidence that any person other than [the target] was in or near the line of fire". 70 AD23d at 979 (internal quotation omitted).
In People v. Bennett, 193 AD2d 808 (2nd Dept 1993) the defendant fired two shots while standing near a group of men. One shot hit a car (as in this case) and the other hit a garage. The Court found the defendant's conviction for Reckless Endangerment in the First Degree legally insufficient since "no evidence was adduced at trial with regard to what the defendant was aiming at when he fired the gun or whether any person was in or near the line of fire".
In People v. Sallitto, 125 AD2d 345 (2nd Dept 1986), appeal dismissed, 69 NY2d 833 (1987) the defendant fired several shots while standing on a raised front porch facing an avenue with moderate to heavy traffic. At least one shot hit a flowerpot on the lawn of the house about 25 feet from the porch and 10-15 feet from the avenue. The Court held the evidence was legally insufficient to constitute Reckless Endangerment in the First Degree noting the evidence indicated the defendant had fired one or more shots "in the general direction" of the avenue with moderate to heavy traffic and that one of the shots hit an object ten feet short of the roadway.
A first degree reckless endangerment conviction was reversed as being against the weight of the evidence in People v. Stanley, 108 AD3d 1129 (4th Dept 2013) lv denied, 22 NY3d 959. In that case, the "defendant stood on a street corner and fired up to five shots from a handgun". The Court held the conviction was against the weight of the evidence because there was no evidence anyone was "in or near the line of fire". (internal quotation and citations omitted).
In the Court's view, the video evidence in this case which showed numerous vehicles and pedestrians at or around the scene of the shooting make this case distinguishable from those where similar circumstances resulted in a finding of legal insufficiency. Not every shooting in a densely populated urban area will result in legally sufficient evidence of depraved indifference. But the combination of the testimony and the video evidence indicating that five shots were fired towards locations where multiple vehicles and persons were present in the street, on sidewalks and in apartments made the evidence in this case, in the Court's view, legally sufficient.
"[I]f a person wantonly and recklessly shoots into a crowd without any specific intent to kill or injure [and] if no injury results, the crime is reckless endangerment in the first degree". People v. Richardson, 97 AD2d 693 (1st Dept 1983) (citation omitted). There was no evidence that occurred here. Rather, the evidence indicated that the shooter intended to hit a specific target, the person the shooter chased out of the subway station.
In the Court's view, however, it was permissible for the People in this case to present evidence the Defendant intended to shoot a specific person but also acted with depraved indifference with respect to bystanders who might also be hit by the 5 shots he fired. See People v. Wilson, 32 NY3d 1 (2018) (a defendant can act both intentionally and with depraved indifference in assaulting the same victim). Thus, in the Court's view, it was permissible in this case for the People to essentially argue both a theory based on the intent to shoot at a specific victim and a theory that the Defendant acted recklessly and with depraved indifference with respect to bystanders he did not intend to hit.
For all of those reasons, the motion to vacate the Defendant's conviction based on newly discovered evidence pursuant to CPL 330.30 (3) is denied, the Defendant's motion to vacate his conviction based on the People's discovery violation is granted and the Defendant's motion to additionally dismiss the Defendant's conviction for Reckless Endangerment in the First Degree based on legal insufficiency is denied. This constitutes the Decision and Order of this Court.
Dated: March 21, 2024
Daniel Conviser, A.J.S.C.